Peelle, J.,
delivered the opinion of the court:
The claim in this case arises under the act of January 20, 1885 (23 Stats. L., 283), known as the French spoliation act, whereby jurisdiction is conferred upon the Court of Claims to consider the “valid claims of citizens of the United States to indemnity upon the French Government arising out of illegal captures, detentions, seizures, condemnations, and confiscations prior to the ratification of the convention between the United States and the French Republic concluded on the *230 thirtieth daj" of September, eighteen hundred, the ratifications of which were exchanged on the thirty-first day of July following. ’’
In the present case the vessel sailed on a commercial voyage June 17, 1799, from North Carolina bound for Martinique, laden with a cargo of tar, live stock, and other goods, and while pursuing her journey was in the same month captured by the French privateer La Légére, Captain Pairandau, and taken into St. Bartholomew, where the vessel and cargo were condemned and sold by the French prize tribunal at Guadeloupe, July 13, 1799, whereby both vessel and cargo became a total loss to-the owners.
The grounds of condemnation were: (1) That the greater part of the cargo consisted of barrels of tar intended for the English island of Barbados; (2) that the vessel was not provided with a crew list.
The question presented is: Were the barrels of tar on board the vessel bound for an English port contraband of war?
The treaty of amity and commerce between the United States and the King of France of February 6, 1778, Public Treaties of the United States, 1873,' pages 203-210, in respect of what goods shall be deemed contraband, article 21, provides that under that designation there “shall be comprehended arms, great guns, bombs with the fuses and other things belonging to thém, cannon ball, gunpowder, match, pikes, swords, lances, spears, halberds, mortars, petards, grenades, saltpeter, muskets, musket ball, bucklers, helmets, breastplates, coats of mail, and the like kinds of arms proper for arming soldiers, musket rests, belts, horses with their furniture, and all other warlike instruments whatever.”
On the other hand the same article of the. treaty provides what shall not be reckoned among contraband or prohibited goods, among which are tar, pitch, ropes, cables, sails, anchors, ship masts, planks, boards and beams, and all other things proper either for building or repairing ships, and such other goods as may not have been worked into the form of anjr instrument or things prepared for war.
That treaty, however, was abrogated bjr the act of July 7, 1798 (1 Stat. L., 578), on the ground that France had re *231 peatedly violated the provisions of the treatjT and refused reparation for the injuries so caused.
As the vessel in the present case was captured and condemned subsequent to that act, the defendant’s contention is that the question whether tar was or was not contraband must be determined b3r the rules of international law, and such has been the holding of the court in these cases.
Vattel, in his work on the Law.of Nations, in substance sajTs that as a neutral has no part in the quarrel between two other nations, she is under no obligations to stop her commerce between those nations. But that to entitle a neutral to the continued enjoyment of neutrality she must not refuse to sell to one. nation while carrying abundant supplies to the other, unless such has been the previous custom of such neutral, in which case she may continue, as she is under no obligations to sacrifice her interest. (Vattel, book 3, p. 336.) But he further sajrs:
“When I have notified to them my declaration of war against such or such a nation, if thejr will afterwards expose themselves to risk in supplying her with things which serve to cany on war, they will have no reason to complain if their goods fall into my possession, and I, on the other hand, do not declare war against them for having attempted to convey such goods. They suffer, indeed, by a war in which they have no concern, but they suffer accidentally. I do not oppose their right, I only exert my own; and if our rights clash with and reciprocally injure each other, that circumstance is the effect of inevitable necessity. Such collisions daily happen in war. When, in pursuance of my rights, I exhaust a country from which you derive your subsistence — when besieging a city with which you carried on a good and profitable trade, I doubtless injure you; I subject you to losses and inconvenience, but it is without any design of hurting you. I onty make use of my rights, and consequently do you no injustice.”
That the commerce of neutral nations may en j oy that freedom consistent with the laws of war, there are, says Vattel, “certain rules to be observed, on which Europe seems to be generally agreed.” The first and obvious rule is “to distinguish ordinary goods which have no relations to war from those that are peculiarly subservient to it. ” The rig:ht to free and uninterrupted trade with nations at war is a right reserved to all neutrals so long as they do not engage in the trade of contra *232 band goods. But when that rule is violated by the vessel of a neutral carrying- contraband, defined by Yattel as “arms, ammunition, timber for shipbuilding, every kind of naval stores, horses, and even provisions in certain junctures when we have hopes of reducing the enemy by famine, the vessel thus carrying such goods to an enemy’s port subjects herself to seizure, condemnation, and sale.”
Such seizure is made, says Vattel, “in order that fear of loss may operate as a check on the avidity of gain and deter the merchants of neutral countries from suppfying the enemy with such commodities.” When the vessel and the innocent cargo belong to the same owner as the contraband they are all involved in the same penalty, and, though the findings in the present case do not show who the owner of the cargo was, it is avered in the petition that the owners of the vessel were also the owners of “her cargo, freight, etc.”
As the tar constituted the principal part of the cargo, it must be presumed that the owners of the vessel, in the absence of any proof to the contrary, had knowledge thereof. In the case of the Maria (1 C. Rob., 372), decided in June, 1799, Sir William Scott said:
“That ter, pitch, and hemp going to the enemy’s use are liable to be seized as contraband in their own nature can not, I conceive, be doubted under the modern law of nations.”
Kent in his Commentaries, volume 1, page 136, after reviewing the conflicting views under varying conditions of such authorities as Grotius, Vattel, Valin, Pothier, and other writers, says:
“The executive government of this country has frequently conceded that the materials for the building, equipment, and armament of ships of war, as timber and naval stores, were contraband.”
During the war between England and France, beginning in 1793, the question of contraband was much discussed, and, says Kent (1 Kent Com., 137):
“We professed to be governed by the modern usage of nations on this point.”
He also at the same page refers to the national convention of France on the 9th of May, 1793, whereby it was “decreed *233 that neutral vessels laden with provisions destined to an enemy’s port should be arrested and carried into France;” and further, that ‘ ‘ one of the earliest acts of Engdand in that war was to detain all neutral vessels going to France, and laden with corn, meal, or flour.”
This was on the theory that by the law of nations all provisions should be considered as contraband, if depriving the enemy thereof “was one of the means employed to reduce him to reasonable terms of peace.” But this claim on the part of England, says Kent, “ was promptly and perseveringly resisted by the United States.”
In the treat}^ of amity, commerce, and navigation between England and the United States of November 19, 1191 (Public Treaties of the United States, pp. 269, 218), in respect of what shall be deemed contrabrand, article 18, among other things, provides:
“Arms and implements serving for the purposes of war by land or by sea, * * as also timber for shipbuilding, tar or rosin, copper in sheets, sails, hemps, ar.d cordage, and generally whatever may serve directly to the equipment of vessels, unwrought iron and fir planks only excepted.”
In referring to that article Kent says (1 Kent Com., 138):
“Our Government has repeatedly admitted that as far as the treaty enumerated contraband articles it was declaratory of the law of nations, and that the treaty conceded nothing on the subject of contraband.”
Hall in his work on International Law, section 212, among other things, says that “ it has always been the practice of England and France to regard horses as contraband” and that “in a large number of treaties they are expressly included;” and further he says that “in none are they excluded, except in a few contracted by llussia and in those between the United States and other American countries, the latter, however confining the prohibition to cavalry mounts. ”. (Other authorities differ as to horses.) Then, following that, in section 213 he says:
“ Materials of naval construction, e. g., ship timber, masts, * * * cordage, copper in sheets, hemp, tar, etc., have been deemed contraband by less general consent. ”
*234 English usage, he says, “bars all such objects from reaching the enemy, but does not treat them as being all equally harmful,” manufactured articles being “looked upon with more suspicion than raw material.” Further he says that “ the American rule on the subject is identical with that of England;” that in a dispute with Spain in 1797 “the United States laid down that ‘ship timber and'naval stores are by the law of nations contraband of war,’ and the courts give expression to a like view.” Thus we see'that by the law of nations naval stores are deemed contraband of war, tar being specially enumerated in the list.
Though, as before stated, while there is no claim here for the cargo, the petition avers that the owners of the vessel were also the owners of the cargo; and, that being so, the ancient rule was, as stated by Kent (1 Kent, 142), that — •
“Contraband articles are said to be of an infectious nature, and they contaminate the whole cargo belonging to the same owners. The innocence of any particular article is not usually admitted to exempt it from the general confiscation. By the ancient law of Europe the ship also was liable to condemnation, and such a penalty was deemed just and supported by the general analogies of law, for the owner of the ship had engaged it in an unlawful commerce, and contraband goods were seized and condemned ex deUeto.”
At the time of the capture and condemnation of the vessel for which indemnity is sought the cargo, principally of tar, bound for an English port, was contraband of war, and therefore the condemnation was legal, and the owners and insurers are not entitled to indemnity.
The case, together with this opinion, will be reported to Congress for their action accordingly.